

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHY REILLY and
KMR LIFESTYLE SERVICES, LLC,

Plaintiffs,

v.

MAURY ROGOFF and
MAURY ROGOFF PR & MARKETING,

Defendants.

12 CV 7200

Case No.

RECEIVED SEP 24 2012 U.S.D.C. S.D. N.Y.

**JURY TRIAL DEMANDED**

Plaintiffs Kathy Reilly ("Reilly" or "Plaintiff") and KMR Lifestyle Services, LLC, d/b/a LifeStylist Advisory ("LifeStylist") (Reilly and LifeStylist, collectively, "Plaintiffs"), by and through their attorneys, Kasowitz, Benson, Torres & Friedman LLP, as for their Complaint against Maury Rogoff ("Rogoff") and Maury Rogoff PR & Marketing ("MRPR") (Rogoff and MRPR, collectively, "Rogoff" or "Defendants"), allege as follows:

**THE PARTIES**

1. Kathy Reilly, a resident of New York, is a marketing and lifestyle business executive and the founder and Chief Executive Officer of KMR Lifestyle Services, LLC, d/b/a LifeStylist Advisory.

2. KMR Lifestyle Services, LLC is a New York limited liability company with its principal place of business at 220 East 73rd Street, New York, New York 10021.

3. Maury Rogoff, a resident of Florida, is a purported marketing and lifestyle agent, as well as the founder and President of Maury Rogoff PR & Marketing.

4. Maury Rogoff PR & Marketing is a Florida corporation with its principal place of business at 701 South Olive Avenue, Suite 1125, West Palm Beach, Florida 33401.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants are residents of different states and the amount in controversy exceeds $75,000.

6. This Court further has subject matter jurisdiction pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1331 because this action arises in part under the Lanham Act, 15 U.S.C. § 1051 et seq.

7. This Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8. This Court may exercise personal jurisdiction over Defendants because Defendants regularly conduct business within New York, and the conduct giving rise to the claims in this action occurred in New York. In addition, according to Defendants' web page, Defendants maintain an office located at 59 East 54th Street, Suite 64, New York, New York 10022.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because, inter alia, Reilly is a resident of New York City and LifeStylist's primary place of business is in New York City.

## FACTUAL ALLEGATIONS

### A. LifeStylist Advisory

10. LifeStylist, an award winning marketing and lifestyle consulting firm, was founded by Reilly in 2009. Prior to founding LifeStylist, Reilly had acquired over 25 years of

experience in marketing and lifestyle business development through her executive employment at American Express and other prestigious companies and clients, including Citibank, Morgan Stanley, Northern Trust, Equinox Fitness clubs and others.

11. LifeStylist specializes in lifestyle program development and lifestyle operations for luxury brands catering to the ultra high net worth audience. LifeStylist's business focuses primarily on concierge program development, event planning, strategic partnership development and consultancy, and also offers a range of marketing and consulting services to its clients.

12. LifeStylist represents a wide range of clients, including Fortune 500 companies and leading financial services companies, as well as high net-worth families and individuals. Throughout the course of her career, Reilly has been lauded for her sterling reputation, her keen business savvy and her ability to operate with the utmost of discretion and confidentiality. She worked tirelessly over the course of her career to develop personal relationships with her clients at the most senior levels, all of whom seek Reilly's assistance and counsel because of her impeccable reputation and highly specialized industry expertise and connections. Critically, in an industry such as this, Reilly's and LifeStylist's reputation is paramount to their success.

**B. LifeStylist's Relationship with Ferrari**

13. Since 2010, Reilly has worked to develop a relationship with Ferrari North America, Inc. ("Ferrari"), one of the world's most discerning and prestigious luxury automobile brands. Reilly and LifeStylist invested heavily in developing this relationship, taking minimal retainers on various projects in order to gain industry knowledge and build trust with Ferrari.

14. It is widely known in the industry that securing flagship clients, such as Ferrari, represents the ultimate business coup due to the fact that this industry operates primarily on the

basis of reputation and name recognition, and serves as the foundation for future luxury business development.

15. During this period of introduction, Reilly was in frequent communication with various Ferrari executives, pitching her capabilities and establishing key relationships that would result in substantial prospective business opportunities. As a result of Reilly's efforts and ability to win Ferrari's trust, LifeStylist was offered the opportunity to work on the following Ferrari projects: (i) the "Influencer Program," in which influential, high-profile individuals would be contacted and offered an opportunity to drive a new make of Ferrari for a weekend, free of charge, in order to generate publicity for the vehicle (the "Influencer Program"), (ii) a Chicago VIP program, (iii) Ferrari's sponsorship of the Access Circles Aspen event, (iv) the Ferrari/XOJET ArtBasel joint sponsorship, and (v) a Luxury Marketing Panel dinner and discussion event with Ferrari and XOJET.

16. Additionally, various executives informed Reilly that Ferrari intended engage LifeStylist to create and manage between twelve (12) and fifteen (15) upcoming events, with the potential to continue beyond those events. Importantly, each of these events would have earned LifeStylist approximately $15,000 per event. Thus, these events alone had the potential value of up to $225,000.

17. Due to the nature of the Ferrari engagement and prevailing industry standards, Reilly could have reasonably expected up to a five (5) year relationship with Ferrari, with a potential value in the millions of dollars.

18. Ferrari's influence in the marketplace is so powerful that, as a result of their relationship with Ferrari, Reilly and LifeStylist were able to obtain lucrative contracts with other influential clients who wished to capitalize on a connection to Ferrari. For example, LifeStylist

had recently entered into a contract with Chartis Inc., a key provision of which was an introduction of Chartis by LifeStylist to Ferrari executives. Reilly's burgeoning relationship with Ferrari was extremely influential in obtaining this contract.

19. In late June 2012, Reilly achieved what can only be referred to as the goal of a lifetime when Ferrari engaged her to spearhead the Influencer Program. Reilly immediately threw her, and LifeStylist's full resources into developing a comprehensive, yet discrete, proposal that would live up to Ferrari's high standards.

20. It was Ferrari's desire that the Influencer Program be run in accordance with strict protocols and guidelines, to maintain the integrity and exclusivity of the program, and to ensure the Ferrari "brand" would not be tarnished. Accordingly, Reilly developed a sophisticated and intricate proposal that involved specific details in the following categories: (i) strategy refinement, (ii) influencer identification and approval, (iii) invitation and participation guidelines and enrollment, (iv) logistics management, (v) ongoing communication with influencers and dealers, (vi) thank you/testimonials, and (vii) follow-up/metrics.

21. A key element of the Influencer Program was the rigorous, multi-layered approval process through which appropriate and desirable candidates would be identified. Reilly's proposal included LifeStylist's development of a potential list of participants, which would be submitted to Ferrari for review and subject to follow-up discussions regarding the specific qualifications of those individuals. Only after Ferrari had signed off were any potential "influencers" to even be contacted.

22. Reilly also crafted an "invitation to participate," subject to Ferrari's approval, which would be sent to pre-screened "influencers" and which outlined the guidelines and rules of

etiquette for participating in the Influencer Program, compliance with which was essential for participation in the program.

**C. Reilly's Relationship With Rogoff**

23. In an effort to maximize the success of the Influencer Program, Reilly engaged in very discrete, high-level discussions with various professionals in the industry who might be able to help identify appropriate candidates for the program. Notably, it is not uncommon to utilize other professionals as an informal resource and source of potential referrals.

24. On or about June 30, 2012, Reilly had occasion to have brief, internal discussions about the Influencer Program with Rogoff, an acquaintance who purports to be a marketing and lifestyle agent with many supposed luxury brand contacts. Indeed, on her web page, Rogoff purports to provide services such as press and media relations, products and trends research, event planning, and online media development, and purports to place clients in New York-based publications and media outlets such as New York Magazine, the New York Times, Good Day New York, and Gotham Magazine.

25. On July 3, 2012, Reilly sent Rogoff a copy of her Influencer Program proposal which had already been submitted to, and approved by, Ferrari. The proposal was highly detailed and specific, and outlined the complicated participant approval process designed to maintain the integrity and exclusivity that Ferrari demanded. Rogoff indicated that she had connections with several individuals who might be interested in participating in the Influencer Program and who would fit the Ferrari profile.

26. At no point did Reilly ever engage or authorize Rogoff to take any action, or act on behalf of Reilly or LifeStylist, in connection with the Influencer Program.

**D. Rogoff Attempts to Appropriate the Ferrari Deal For Herself**

27. During the first week of July 2012, Rogoff sent an email (the "Rogoff Email") to a number of individuals who had not been approved (nor would they have been) by Ferrari to receive any such communication, in which Rogoff claimed to represent Ferrari in connection with the Influencer Program. This claim was untrue and entirely fraudulent. Rogoff never had been authorized by Reilly, let alone Ferrari, to send any such communication on Ferrari's behalf. Rogoff never informed Reilly that she intended to send this email, and she sent it in complete disregard of the pre-approval process required by Ferrari.

28. Upon information and belief, Rogoff sent the Rogoff Email in an attempt to steal away Plaintiffs' business relationship with Ferrari, which Rogoff did in order to appropriate both the monetary value of the Ferrari relationship, as well as to boost her own reputation in the industry, improve her business and align herself with this very prestigious brand.

29. Rogoff's unauthorized emails in no way reflected the proposal Reilly meticulously drafted. Rather, Rogoff's email was extremely casual and tacky, replete with bad graphics, inaccurate information and poor punctuation. Suffice it to say, no professional who claims to represent and service high-end luxury clients and Fortune 500 companies would ever send such an email. To add insult to injury, Rogoff poached small sections of Reilly's proposal in order to give the email credibility and create the illusion that Rogoff was affiliated with Reilly and/or Ferrari when in truth, she had no business relationship whatsoever with Plaintiffs or Ferrari.

30. One of the recipients of the Rogoff Email was Jason Binn, an influential and widely connected publisher in the New York area. Binn had not been approved to participate in the Influencer Program. Incredibly, Binn does not even drive a car. Nevertheless, Rogoff sent

her unauthorized invitation to Binn. Rogoff did not even have Binn's most current email address -- which demonstrates she had no personal relationship with him -- revealing the lengths she went to in order to send this unauthorized communication.

31. On the same day that Binn received the Rogoff Email, he forwarded the message to the Chief Executive Officer of Ferrari, commenting, "Wow. I am not an A Lister for sure."

32. The CEO instantly forwarded Binn's email to Ferrari's Head of Marketing (and Reilly's client), expressing outrage at the manner in which Rogoff had presented the Influencer Program, and demanding to know (a) who Rogoff was, and (b) why she was sending such a ridiculous email.

33. Ferrari's Head of Marketing forwarded this entire email chain to Reilly, informing her that the approach taken by Rogoff was not acceptable to Ferrari and the email was not an appropriate method of first contact under the Influencer Program (which any seasoned PR professional would know), and asking why Reilly's staff had taken such an unacceptable approach. Clearly, the Ferrari executives believed Reilly authorized Rogoff's actions because Rogoff misappropriated pieces of Reilly's proposal in the Rogoff Email (which was sent to Rogoff for the sole purpose of familiarizing her with the Influencer Program protocol approved by Ferrari), which Ferrari executives would have been familiar with.

34. Reilly was horrified to discover Rogoff's actions and the immediately severe consequences resulting therefrom. Reilly immediately responded that Rogoff was not a person on her staff, that the Rogoff Email was not authorized by Reilly, and that she was completely unaware of Rogoff's intentions to send it. Reilly apologized profusely for Rogoff's outrageous conduct. Reilly told Ferrari's Head of Marketing that she merely had reached out to Rogoff, as well as other lifestyle professionals, to determine whether Rogoff had connections with

individuals who might be appropriate candidates for the Influencer Program. Notably, none of the other lifestyle professionals with whom Reilly spoke engaged in any such inappropriate actions.

35. Despite Reilly's best efforts to mitigate the situation, the damage caused by Rogoff's conduct had been done. Ferrari immediately removed Reilly from the Influencer Program, and disengaged Reilly from other networking events for which Ferrari previously engaged her. These events would have resulted in a significant income stream for Reilly and would have been immeasurably beneficial because, in addition to building further ties with Ferrari, the events would have allowed Reilly to gain access to other luxury brands and high-powered clients which could have further developed her business and network.

36. Since Rogoff's outrageous actions, Reilly has not been asked to represent Ferrari and, notably, has been excluded from the many events for which she had previously been engaged.

37. The loss of the relationship with Ferrari meant the loss of potentially millions of dollars in business from Ferrari alone, not to mention the many other prospective clients to which Reilly would have gained access. Further lost was the extensive time and resources that Reilly invested into developing the Ferrari relationship. In addition to causing Reilly substantial embarrassment amongst her industry peers -- many of whom were aware of this recent win by LifeStylist -- the loss of Ferrari as a client caused irreparable harm to Reilly's reputation in the industry.

38. Rogoff's misconduct will also have a domino effect on Reilly's business, due to the fact that the loss of the Ferrari relationship will have a very serious impact on LifeStylist's

other client, and prospective client, relationships. Overall, the damage to LifeStylist's business was catastrophic.

**E. Rogoff Admits to Her Wrongful Conduct**

39. As soon as Reilly received the email from Ferrari's Head of Marketing, she called Rogoff to confront her about her egregious conduct. Rogoff apologized profusely over the phone and admitted her wrongdoing.

40. In an email that same day, Rogoff continued to apologize and stated: "**I am 100% to blame**." Rogoff continued, "I reached out to Jason when I shouldn't have; tell them **that I completely did it on my own and shouldn't have** . . . It was the wrong call."

41. Rogoff sent Reilly a second, handwritten apology note, in which she said "I am so sorry for all that I've done and am sincerely sorry for the pain and embarrassment that I've caused you. I wish that I could undo what I've done. I am so sorry and feel awful."

42. Of course, Rogoff's acknowledgement of her wrongdoing could not undo the irreparable harm her misconduct caused to Reilly's professional reputation and career.

43. Shortly thereafter, counsel for Reilly and LifeStylist sent Rogoff a cease-and-desist letter demanding that she refrain from engaging in any future conduct that could harm Reilly and/or LifeStylist. Not surprisingly, Rogoff never responded.

**AND AS FOR A FIRST CAUSE OF ACTION**
**(False Advertising Under the Lanham Act)**

44. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 43 above as if fully set forth herein.

45. As a marketing and consulting executive, Rogoff (and her company) is competitive with Reilly and LifeStylist's business.

46. Defendants sent the Rogoff Email for the purpose of identifying herself and her company with the Ferrari Brand.

47. By sending the Rogoff Email and misrepresenting herself as an authorized Ferrari promoter, Rogoff made a false and misleading statement of fact about the Ferrari brand and her connection therewith.

48. The statements made in the Rogoff Email by Rogoff had the capacity to deceive a substantial segment of potential consumers.

49. The statements made in the Rogoff Email did in fact mislead consumers, as evidenced by Binn's email to Ferrari's CEO regarding his false invitation to participate in the Influencer Program, in which he was not authorized to participate.

50. Rogoff's statements in the Rogoff Email were literally false in that Rogoff purported to offer consumers access to a product which she was not authorized to offer and could not deliver.

51. The Rogoff Email was sent as a promotion by Rogoff.

52. The Rogoff Email caused serious and substantial damage to Plaintiffs' business and reputation by causing Ferrari to terminate its relationship with them, which represented not only hundreds of thousands of dollars in current business but also potentially millions of dollars in future contracts, and endangered a number of LifeStylist's other business contracts as a result.

53. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, which amount represents the value of the current and potential future contracts with Ferrari lost by Plaintiffs, as well as the value of contracts with other clients dependent on a relationship with Ferrari, together with interests, attorney's fees and costs.

54. Additionally, the actions of the Defendants were committed knowingly, willfully, intentionally, maliciously and in conscious disregard of Plaintiffs' rights. Therefore, Plaintiffs seek an award of treble damages pursuant to 15 U.S.C. § 1117(a).

55. Plaintiffs further seek a full accounting of Rogoff's business and personal assets, including but not limited to business records, balance sheets, tax returns, and bank statements.

**AND AS FOR A SECOND CAUSE OF ACTION**
**(Deceptive Acts and Practices Under N.Y. Gen. Bus. Law § 349(a))**

56. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 55 above as if fully set forth herein.

57. Rogoff engaged in deceptive acts and practices through her false and misleading statements in the Rogoff Email.

58. Despite having no connection to Ferrari, Rogoff portrayed herself as an agent and representative thereof by sending the Rogoff Email to numerous potential consumers.

59. Rogoff also portrayed herself as an agent and representative of Plaintiffs.

60. Defendants' acts were likely to mislead, and did in fact mislead, consumers by purporting to offer access to Ferrari, when in reality Defendants could not provide such access, and by presenting themselves as being affiliated with brands and companies to which they had no connection.

61. Concrete evidence exists that Defendants' acts actually misled consumers. Indeed, Binn's email to Ferrari's CEO demonstrates that Binn believed he had received a genuine offer from Ferrari and/or its authorized representative to participate in the Influencer Program.

62. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, which amount represents the value of the current and potential future

contracts with Ferrari lost by Plaintiffs, as well as the value of contracts with other clients dependent on Plaintiffs' relationship with Ferrari, together with interests, attorney's fees and costs.

63. Additionally, the actions of the Defendants were committed knowingly, willfully, intentionally, maliciously and in conscious disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages in an amount to be determined by a jury at trial.

**AND AS FOR A THIRD CAUSE OF ACTION**
**(Unfair Competition)**

64. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 63 above as if fully set forth therein.

65. Defendants engaged in unfair competition with Reilly and LifeStylist by misappropriating their goodwill in the lifestyle market.

66. Specifically, by sending the Rogoff Email, and misappropriating pieces of the proposal crafted by Reilly, Defendants misrepresented themselves as being affiliated with Plaintiffs and sought to benefit from the goodwill associated with Reilly's name and reputation.

67. Defendants further misappropriated Reilly's goodwill by portraying themselves as being affiliated with Ferrari, a relationship that was developed solely on the basis of Reilly's hard work and stellar reputation.

68. Defendants sought to personally benefit from their misrepresentation.

69. Defendants unfairly took advantage of Reilly's hard work and impeccable reputation by attempting to pass themselves as agents of Reilly and LifeStylist.

70. Defendants used Reilly's personal property, in the form of the Influencer Program proposal, to provide legitimacy to the Rogoff Email. In doing so, she ultimately competed against Plaintiffs' business interests by representing themselves as an agent of Ferrari.

71. As a direct and proximate result of Defendants' unfair competitive actions, Plaintiffs lost Ferrari's business, as well as access to other prospective clients they would have otherwise gained through a relationship with Ferrari.

72. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, which amount represents the value of the current and potential future contracts with Ferrari lost by Plaintiffs, as well as the value of contracts with other clients dependent on a relationship with Ferrari, together with interests, attorney's fees and costs.

73. Additionally, the actions of the Defendants were committed knowingly, willfully, intentionally, maliciously and in conscious disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages in an amount to be determined by a jury at trial.

**AND AS FOR A FOURTH CAUSE OF ACTION**
**(Tortious Interference With Business Relations)**

74. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 73 above as if fully set forth herein.

75. Defendants knew and were aware of the fact that Plaintiffs had been engaged by Ferrari to represent the brand through the Influencer Program and that Plaintiffs had ongoing business relations with Ferrari.

76. Defendants' intentional misconduct, which included the dissemination of the Rogoff Email without authorization, caused Ferrari to remove Plaintiffs from their participation in the Influencer Program and to discontinue its business relationship with Plaintiffs.

77. Defendants' misconduct was intentional and malicious, and was committed for the purpose of interfering with Plaintiffs' business relationship with Ferrari and for the purpose of attempting to appropriate that relationship for them.

78. As a direct and proximate result of Defendants' misconduct, Ferrari ceased its business relations with Plaintiffs.

79. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, which amount represents the value of the current and potential future contracts with Ferrari lost by Plaintiffs, as well as the value of contracts with other clients dependent on a relationship with Ferrari, together with interests, attorney's fees and costs.

80. Additionally, the actions of the Defendants were committed knowingly, willfully, intentionally, maliciously and in conscious disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages in an amount to be determined by a jury at trial.

**AND AS FOR A FIFTH CAUSE OF ACTION**
**(Tortious Interference With Prospective Business Advantage)**

81. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 80 above as if fully set forth herein.

82. Defendants knew and were aware of, or should have known and been aware of, the Plaintiffs' future business opportunities with Ferrari.

83. Defendants' intentional misconduct caused Ferrari to disassociate itself from future representation by Reilly. In fact, Reilly has been uninvited from all future Ferrari events.

84. As a direct and proximate result of Defendants' misconduct, Plaintiffs' reputations have been tarnished to the point that Ferrari will not have any dealings with them.

85. The loss of the relationship with Ferrari also means that Plaintiffs will lose the business of the myriad prospective clients they would have had access to as a result of their business relationship with Ferrari.

86. Defendants' actions have jeopardized current contracts Plaintiffs have with clients which contained "introduction" clauses that require Reilly to introduce them to Ferrari.

87. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, which amount represents the value of the current and potential future contracts with Ferrari lost by Plaintiffs, as well as the value of contracts with other clients dependent on a relationship with Ferrari, together with interests, attorney's fees and costs.

88. Additionally, the actions of the Defendants were committed knowingly, willfully, intentionally, maliciously and in conscious disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages in an amount to be determined by a jury at trial.

**AND AS FOR A SIXTH CAUSE OF ACTION**
**(*Prima Facie* Tort)**

89. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 88 above as if fully set forth herein.

90. Defendants intentionally committed harm against Plaintiffs without excuse or justification through means that would otherwise have been lawful, absent their malicious intent.

91. As a result of Defedants' intentional misconduct, Plaintiffs suffered special damages in the loss of the Influencer Program, all other events for which they had been engaged by Ferrari, and the value of the expected five (5) year relationship with Ferrari.

92. Plaintiffs suffered further special damages through the loss of prospective clients who they no longer have access to as a result of Ferrari's disengagement of LifeStylist and the harm to Plaintiffs' reputation in the industry.

93. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, which amount represents the value of the current and potential future contracts with Ferrari lost by Plaintiffs, as well as the value of contracts with other clients dependent on a relationship with Ferrari, together with interests, attorney's fees and costs.

94. Additionally, the actions of the Defendants were committed knowingly, willfully, intentionally, maliciously and in conscious disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages in an amount to be determined by a jury at trial.

**AND AS FOR A SEVENTH CAUSE OF ACTION**
**(Negligence)**

95. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 94 above as if fully set forth herein.

96. In the alternative, by sending the Rogoff Email, Defendants -- whether authorized or not – unilaterally undertook to provide a service to Plaintiffs by reaching out to prospective participants in the Influencer Program.

97. Defendants were negligent in providing this service by failing to obtain authorization prior to sending the Rogoff Email, by sending the email to individuals who had not been pre-approved to participate in the program, and by sending an entirely inappropriate email that did not come remotely close to meeting Ferrari's standards, let alone commonly understood and recognized industry standards.

98. Defendants' conduct directly and proximately caused harm to Plaintiffs' business and reputation by causing Ferrari to terminate its relationship with them, resulting also in the loss of prospective clients they could have obtained through the Ferrari relationship, and damage to their business reputations.

99. Defendants' misconduct placed Plaintiffs in a worse position than they otherwise would have been had the Rogoff Email never been disseminated.

100. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, which amount represents the value of the current and potential future

contracts with Ferrari lost by Plaintiffs, as well as the value of contracts with other clients dependent on a relationship with Ferrari, together with interests, attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREAS**, Plaintiffs respectfully request judgment against Defendants as follows:

A. On the First Through Seventh Causes of Action, a money judgment against Defendants, jointly and severally, in an amount to be determined at trial, representing lost current and future profits to Plaintiffs and compensatory damages;

B. On the First Cause of Action, treble damages pursuant to 15 U.S.C. §1117(a);

C. On the Second through Sixth Causes of Action, punitive damages in an amount to be determined at trial;

D. An award of costs and reasonable attorney's fees;

E. A full accounting of Defendants' business and personal assets; and

F. An award of such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial with respect to all matters so triable.

Dated: New York, New York
September 24, 2012

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: ______________________

Joseph A. Piesco, Jr.
Julia Diprete
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800
(jpiesco@kasowitz.com)

*Attorneys for Plaintiffs Kathy Reilly and KMR Lifestyle Services, LLC*